# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DALE M. GERFIN, *et al.*, | : | CIV. NO. 3:23-CV-01037 |
| | : | |
| Plaintiffs, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| SOUTHWESTERN ENERGY | : | |
| PRODUCTION COMPANY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. Introduction.

The plaintiffs are two married couples: (1) Nancy and Dale Gerfin ("the Gerfins") and (2) Aline and Ordie Price ("the Prices"). The Gerfins and the Prices each entered into lease agreements with the defendant, Southwestern Energy Production Company[1] ("SWN"), allowing the development of natural gas on their properties. The plaintiffs now bring claims for breach of contract based on SWN cross-unit drilling on their properties without the plaintiffs' written consent. Currently pending is a motion to dismiss count one of the complaint. For the reasons set forth below, we deny the motion to dismiss.

---

[1] According to the defendant, "Southwestern Energy Production Company no longer exists[,]" and "[t]he correct entity for purposes of this litigation is SWN Production Company LLC[.]" *Doc. 1* at 1 n.1. We will follow the defendant's convention and refer to the defendant as "SWN" hereafter.

## II.  Background and Procedural History.

The plaintiffs initiated this action by filing a complaint in the Court of Common Pleas of Susquehanna County on May 12, 2023. *See doc. 1-2* at 2.  SWN removed the case to this Court on June 22, 2023. *Doc. 1.*  On June 29, 2023, SWN filed a motion to dismiss Count One of the complaint ("motion to dismiss Count One") and, later, a brief in support thereof. *Docs. 3, 4.*  After filing a motion for extension of time (*doc. 5*), which we granted (*doc. 6*), the plaintiffs filed a brief in opposition (*doc. 7*) to the motion to dismiss Count One on August 3, 2023.  SWN filed a reply brief on August 17, 2023. *Doc. 8.*

On September 15, 2023, the parties consented to our jurisdiction pursuant to 28 U.S.C. § 636(c). *Doc. 10.*  On October 20, 2023, SWN filed a motion to stay discovery until after we decide the pending motion to dismiss. *Doc. 11.*  After full briefing of the motion to stay discovery (*docs. 12, 13, 15*) and a telephone discovery conference (*docs. 14, 17*), we granted the motion to stay discovery in part, staying discovery deadlines but permitting discovery regarding count two of the complaint (*doc. 16*).

The following facts come from the complaint and the contracts attached thereto.[2]  In November 2007, the Gerfins and the Prices "entered into . . . Oil and

---

[2] We note for the parties that the facts we lay out here come only from the complaint and its exhibits.  To the extent that there are additional facts alleged in the briefs, they are not considered. *See Pennsylvania ex. rel. Zimmerman v.*

Gas Lease[s] with Addendum[s] [("the Leases")]. . . with the Defendant, [SWN], for developing natural gas on their propert[ies]." *Doc. 1-2* at 4; *see also doc. 1-2* at 16, 34.  The Gerfins and the Prices "collectively negotiated the same lease terms for their properties and all terms and conditions within the [L]eases apply identically to all [the p]laintiffs." *Id.*  Importantly, the Leases included the following addendum ("Consent Addendum"):

> All Leaseholds included in this Lease shall be pooled/unitzed with, and only with, [certain parcels listed here by parcel number], to be included in a single consolidated pooled unit.  If additional pooling/unitization or other forms of pooling/unitization are requested by [SWN], [SWN] must obtain prior written consent of [the plaintiffs].

*Doc. 1-2* at 25–26.

In 2011, SWN built an access road on the plaintiffs' properties and a well pad on the Prices' property. *Id.* at 4.  SWN also "established two pooled units, and thereafter drilled and completed horizontal producing natural gas wells in such units." *Id.* at 4–5.  The plaintiffs describe these actions as "in accordance with the terms of the . . . [L]eases." *Id.* at 5.  The plaintiffs received their first royalty payments in November of 2012. *Id.* at 6.  SWN "continues to operate and produce such unit wells." *Id.*

---

*PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)).

At some unspecified time, SWN "drill[ed] and complete[d] two . . . horizontal cross[-]unit wells across the [p]laintiffs' properties and into" properties not owned by the plaintiffs ("cross-unit drilling" or "cross-unit wells"). *Id.* To do so, SWN "hydraulically fractur[ed] the same producing gas formation" that the pre-existing unit wells already tapped into, thus, the cross-unit drilling "interfer[es] with and reduc[es] the production of the original unit wells." *Id.* SWN did not, however, obtain the plaintiffs' consent to complete the cross-unit drilling. *Id.* The plaintiffs allege that this violated the Consent Addendum. *Id.*

Further, in order to complete the cross-unit drilling, SWN "widened the access roads within the [p]laintiffs' properties without compensation[.]" *Id.* at 6. The plaintiffs, however, had not given their "permission to use the surface and subsurface of [their] properties to drill and complete the new cross[-]unit wells from the existing well pad." *Id.* at 7. Rather, the plaintiffs had objected in writing. *Id.* Further, when SWN widened the access roads it "damaged adjoining [sic] within the [p]laintiffs' properties and failed to repair" the damage. *Id.* at 6. According to the plaintiffs, SWN continues to use the well pad for this improper purpose. *Id.*

Since SWN completed the cross-unit drilling, SWN "has not furnished [the p]laintiffs with division orders or other written explanation of their royalty interest decimal share production." *Id.* And the plaintiffs' "royalty interests have now been

diluted and, as such, they have a smaller ownership percentage of the new cross[-] unit gas wells and suffer reduced production from the original unit wells." *Id.*

The plaintiffs bring two counts against SWN.  Count One is for breach of contract based on SWN's cross-unit drilling without the plaintiffs' written consent as required by the Consent Addendum. *Id.* at 6–7.  Count Two is for trespass based on SWN entering onto the properties to use the well pad for cross-unit drilling without permission and widening the access road. *Id.* at 7–8.  The plaintiffs allege that SWN physically damaged their properties and reduced "their ownership interest[.]" *Id.* at 7–8.  The plaintiffs thus seek compensation "for the reduction in their ownership interest as a result of the" cross-unit drilling, "plus interest, costs[,] and attorney's fees[,]" as well as monetary damages for the trespass. *Id.* at 7, 8. The plaintiffs further seek a declaration that SWN breached the lease agreements. *Id.* at 5.  SWN now moves for dismissal of Count One. *Doc. 3*.

### III.  Pleading and Motion-to-Dismiss Standards.

In accordance with Fed. R. Civ. P. 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  When reviewing a motion to dismiss under Rule 12(b)(6), "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether [the] plaintiff may be entitled to

relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).

In making that determination, "[g]enerally, 'a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).  In addition to considering the allegations of a complaint, in connection with a 12(b)(6) motion, the court may consider "'exhibits attached to the complaint and matters of public record.'" *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  "Further, courts may consider exhibits attached to a defendant's motion to dismiss if it is 'an undisputedly authentic document' and 'plaintiff's claims are based on the document.'" *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127 (3d Cir. 2016) (quoting *Pension Benefit Guar. Corp.*, 998 F.2d at 1196).  In other words, the court may consider "document[s] *integral to or explicitly relied* upon in the complaint" in connection with a 12(b)(6) motion. *Schmidt*, 770 F.3d at 249 (italics in original) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426).

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch.*

*Dist.*, 842 F. Supp. 2d 762, 769–70 (M.D. Pa. 2012).   "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).   The statement required by Rule 8(a)(2) must give the defendant fair notice of the nature of the plaintiff's claim and of the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).   Detailed factual allegations are not required, but more is required than "labels," "conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).   "A complaint has to 'show' such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court "'must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party.'" *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 437 (3d Cir. 2018) (quoting *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015)).   But a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).   A court also need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff

has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal*, a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010) (footnote and citations omitted) (quoting *Iqbal,* 556 U.S. at 675, 679).

In sum, "[w]e accept as true all factual matters [the plaintiff] alleges, but his complaint cannot survive unless the facts it recites are enough to state plausible grounds for relief." *Beasley v. Howard*, 14 F.4th 226, 231 (3d Cir. 2021) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But "[a] claim that relies just on 'conclusory statements,' or on

8

'threadbare recitals of the elements of a cause of action' without supporting factual allegations, does not establish plausible grounds for relief." *Id.* (quoting *Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 561 (3d Cir. 2020)).

## IV. Discussion.

### A. The Parties' Arguments.

SWN moves for dismissal of Count One of the complaint because, according to SWN, the Consent Addendum "does not encompass cross-unit drilling[,]" and "Pennsylvania law allows cross-unit wells unless expressly prohibited by the lease[.]" *Doc. 3* at 1–2.  More specifically, SWN argues in its brief in support that it is obligated by the contract only to obtain the plaintiffs' consent prior to "pooling" and "unitization," neither of which describes cross-unit drilling. *Doc. 4* at 11–16.  In aid of this argument, SWN sets forth the industry standard definitions of pooling and unitization and argues that the Leases follow that meaning. *Id.* at 12–13.  SWN further argues that a Pennsylvania statute ("Act 85")[3] authorizes the cross-unit drilling here where the Leases do not expressly forbid it. *Id.* at 17–18.

While also setting forth alleged facts that are not contained in the complaint (*doc. 7* at 13–14), which we ignore during the motion to dismiss stage, the

---

[3] Act 85 permits cross-unit drilling on leased land where the lease does not expressly prohibit cross-unit drilling. 58 P.S. § 34.2.  We discuss this statute in further detail below.

plaintiffs argue in their brief in opposition that, pursuant to contract law, the parties' intent when entering into the contract should control (*doc. 7* at 14–15). The plaintiffs explain that their intent in drafting the Consent Addendum was to avoid the "dilution" of their royalty share income. *See doc. 7* at 14.  And because cross-unit wells dilute landowners' royalty share incomes, like pooling and unitization, the plaintiffs argue that cross-unit drilling can be read into the Consent Addendum. *See id.*  As to Act 85, the plaintiffs claim that their intent "is dispositive" here as well, because Act 85 permits lessees to "expressly prohibit[ ]" cross-unit drilling, presumably for the purpose of allowing lessees to protect their royalty share from dilution. *Id.* at 18.  The plaintiffs also argue that SWN has failed to comply with other provisions of Act 85 (*doc. 7* at 18–19), but as this is outside the scope of the complaint and the present motion to dismiss, we will not further address these claims. *See Pennsylvania ex. rel. Zimmerman*, 836 F.2d at 181 ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citing *Car Carriers, Inc.*, 745 F.2d at 1107).

In its reply brief, SWN argues that the plaintiffs have failed to show an ambiguity in the contract and, accordingly, the court should find that the use of the terms pooling and unitization in the contract are consistent with industry standard definitions and thus must each only have one meaning, neither of which include cross-unit drilling. *Doc. 8* at 3–4.  SWN further protests against the plaintiffs'

argument that the terms pooling, unitization, and cross-unit drilling are interchangeable, explaining that such a reading of these terms would make certain contractual terms superfluous. *Id.* at 9.

### B.  Act 85.

"In November 2019, Governor Tom Wolf signed into law Pennsylvania Act 85 of 2019, which amended the Pennsylvania Oil and Gas Lease Act, 58 P.S. § 33.1 *et seq.*" *Warner Valley Farm LLC v. SWN Production Company, LLC*, 652 F. Supp. 3d 495, 499 (M.D. Pa. 2023) (footnotes omitted).  "Act 85 added section 34.2 to the Oil and Gas Lease Act, which provides" that cross-unit drilling by lessors is permitted if, among other things, it "is not expressly prohibited by the terms of [the] lease." *Id.* (citing 58 P.S. § 34.2).  "Put differently, Act 85 allows a lease operator who has the right to produce oil from two different units to use one well to produce oil or gas from both units (cross-unit drilling), a practice that was generally prohibited due to statutory restrictions on well placement and setback requirements." *Id.*  "Legislative history explains that Act 85's purpose was to increase efficiency and reduce the environmental impact of oil and gas drilling by decreasing the number of wells necessary, commensurately reducing the need for additional appurtenant oil and gas production facilities." *Id.*

The parties do not dispute that Act 85 applies to the Leases. *See docs. 4, 7, 8.* SWN, therefore, is permitted to cross-unit drill on the plaintiffs' properties unless cross-unit drilling is "expressly prohibited by the terms of [the L]ease[s]." 58 P.S. § 34.2.  The parties do not point to, and we have been unable to find, case law elucidating the standard for express prohibition as is required by Act 85.  We thus rely on principles of contract law to establish whether the Leases expressly prohibit cross-unit drilling.

### C.  Consent Addendum.

"Oil and gas leases are interpreted just like any other contract." *Chambers v. Chesapeake Appalachia, L.L.C.*, 359 F. Supp. 3d 268, 274 (M.D. Pa. 2019).  "The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties." *Maisano v. Avery*, 204 A.3d 515, 520 (Pa. Super. Ct. 2019) (quoting *Ramalingam v. Keller Williams Realty Grp., Inc.*, 121 A.3d 1034, 1046 (Pa. Super. Ct. 2015)).  "When a writing is clear and unequivocal, its meaning must be determined by its contents alone." *Id.* (quoting *Ramalingam*, 121 A.3d at 1046).  "A court may, however, look outside the 'four corners' of a contract if the contract's terms are unclear: '[w]here the contract terms are ambiguous and susceptible of more than one reasonable interpretation,

. . . the court is free to receive extrinsic evidence, i.e., parol evidence, to resolve the ambiguity.'" *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 425 Pa. Super. 204, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)).

"Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous." *Baldwin v. University of Pittsburgh Medical Center*, 636 F.3d 69, 76 (3d Cir. 2011). "To make that determination, a court must consider 'the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.'" *Baldwin*, 636 F.3d at 76 (quoting *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980)). "A mere difference in interpretation, however, does not render a contract ambiguous." *Chambers*, 359 F. Supp. 3d at 275 (citing *Metzger v. Clifford Realty Corp.*, 327 Pa. Super. 377, 476 A.2d 1, 5 (1984)). Rather, "[a] contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Maisano v. Avery*, 204 A.3d 515, 520 (Pa. Super. Ct. 2019) (quoting *Ramalingam*, 121 A.3d at 1046).

"Ambiguity in a contract can be either patent or latent." *Bohler-Uddeholm America, Inc.*, 247 F.3d at 93. "While a patent ambiguity appears on the face of the instrument, 'a latent ambiguity arises from extraneous or collateral facts which

make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.'" *Id.* (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995)).  "Lest the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to the parties['] linguistic reference.  The parties' expectations, standing alone, are irrelevant without any *contractual hook* on which to pin them." *Id.* (internal quotations and alterations omitted) (quoting *Duquesne Light*, 66 F.3d at 614 (itself quoting *Mellon Bank*, 619 F.2d at 1011 n.12).

Here, the Consent Addendum lays out certain permitted pooling and unitization and forbids "additional pooling/unitization or other forms of pooling/unitization" without the plaintiffs' prior written consent. *Doc. 1-2* at 25–26.  Neither pooling nor unitization are defined in the contract itself.

"'Pooling' and 'unitization' [however] are terms of art in the oil and gas industry." *Warner Valley Farm, LLC*, 652 F. Supp. 3d at 508 (citing 3 KUNTZ, LAW OF OIL AND GAS § 42.5 (2022)).  "Although the terms 'pooling' and 'unitization' are frequently used interchangeably," these terms are distinct. *Neuhard v. Range Resources-Appalachia, LLC*, 29 F. Supp. 3d 461, 470 n.10 (M.D. Pa. 2014).  "'[P]ooling' means the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules[.]" *Id.* at

14

470 n.10.  And "[t]he primary legal consequence of pooling oil and gas leases is

that production and operations anywhere on the pooled unit are treated as if they

have taken place on each tract within the unit." *Butters Living Trust v. SWEPI, LP*,

No. 4:12-cv-02010, 2013 WL 3679533, *1 n.1 (M.D. Pa. July 12, 2013).

Unitization, on the other hand, "'refers to the consolidation of mineral or leasehold

interests in oil or gas covering a common source of supply.'" *Id.* at 470 (quoting

*Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1410 (10th Cir. 1990)).  "The

unitization of oil and gas production permits the entire field or a substantial part of

it to be operated as a single entity without regard to surface boundary issues."

*Butters Living Trust*, 2013 WL 3679533, *1 n.1; *see also Linder v. SWEPI, LP*,

549 Fed. Appx. 104, 106 n.1 (3d Cir. 2013) ("When oil and gas producers have

more than one leasehold in an area, they may unitize so the producer can extract

more oil and gas from the unit with fewer wells by treating the unitized acreage as

its own production unit.").

   Cross-unit drilling, however, as discussed above, occurs when "a lease

operator who has the right to produce oil from two different units . . . use[s] one

well to produce oil or gas from both units[.]" *Warner Valley Farm LLC*, 652 F.

Supp. 3d at 499.  As such, cross-unit drilling is distinct from pooling and

unitization. *Cf id.* at 508 ("Had [the lease] restricted the [broad unitization]

provision to unitizing or pooling . . . the provision might be susceptible to an

interpretation that bars cross-unit drilling.").  The plaintiffs' argument that pooling, unitization, and cross-unit drilling are interchangeable will not, therefore, prevail.

The Consent Addendum, however, does not require consent simply for "pooling/unitization"; rather, the Consent Addendum requires consent for "additional pooling/unitization or other forms of pooling/unitization[.]" *See doc. 1-2 at 25–26.*  If the parties meant to require consent only for pooling and unitization with properties other than those enumerated in the Consent Addendum, it appears to us that requiring consent for "additional pooling/unitization" would accomplish this objective.  But the Consent Addendum does not stop there.  Instead, the Consent Addendum also requires consent for "*other forms* of pooling/ unitization[.]" *Id.* (emphasis added).  It is this second clause that we find to be, if not an ambiguity in and of itself, the "contractual hook" upon which a latent ambiguity may rest.  And the parties' have not specifically addressed how Act 85's requirement of "express prohibition" impacts our contractual analysis.

Moreover, we echo "Judge Caputo's observation in *Chambers*[, 359 F. Supp. 3d at 275,] that because 'oil and gas leases are laden with terms of art' and a judge's 'linguistic field of expertise may not overlap with the parties[']," deciding issues related to gas leases is often best undertaken on summary judgment." *Diehl v. SWN Production Co., LLC*, No. 3:19-CV-1303, 2020 WL 1663342, *7 (M.D.

Pa. Apr. 3, 2020).   We cannot say at this juncture that the Leases are not

ambiguous.   Accordingly, the claims survive the motion to dismiss.


**V.  Conclusion.**

For the foregoing reasons, we deny the motion to dismiss Count One. *Doc.*

*3*.  We will thus unstay discovery.   Appropriate orders follow.


<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge